950 F.2d 1196
 21 Fed.R.Serv.3d 1152
 Brian Lee ELLISON, Plaintiff-Appellant,
Aetna Casualty & Surety Co., Intervenor-Appellant,
v.
CONOCO, INC., Defendant-Appellee-Appellant,
v.
ASSOCIATED OILFIELD SERVICES, INC., Defendant-Appellee.
 No. 90-3360.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 24, 1992.
 
 Mark E. Hanna, Martin E. Regan, Jr., Regan & Associates, New Orleans, La., for Ellison.
 Timothy M. Waller, Sr., Lenfant & Associates, Metairie, La., for Aetna.
 Lawrence E. Best, Peter S. Koeppel, Abbott, Webb, Best & Meeks, New Orleans, La., for Conoco.
 Lawrence J. Ernst, Charles M. Lanier, Jr., Christovich & Kearney, New Orleans, La., for Associated Oilfield.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before HENLEY,* KING, and GARWOOD, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 Plaintiff-appellant Brian Lee Ellison (Ellison) was injured in an offshore oilfield accident involving snubbing equipment operated by his employer, Snubbing Services, Incorporated (SSI). Ellison sued Conoco, Incorporated (Conoco), the company for whom Ellison's employer was performing subcontracting work, and Associated Oilfield Services (Associated), the alleged owner of the snubbing equipment. Ellison suffered summary judgment on all of his claims against Associated, and on all but a negligence claim against Conoco. After a jury trial on the sole issue of Conoco's negligence, Ellison's favorable verdict was overturned by the district judge's decision to grant Conoco's motion for judgment notwithstanding the verdict (JNOV). Ellison appeals the JNOV, and, alternatively, the adverse summary judgments. Conoco cross-appeals the summary judgment in favor of Associated. We affirm.
 
 Facts And Proceedings Below
 
 2
 On September 7, 1984, Ellison suffered extensive personal injuries as a result of an incident involving oilfield snubbing equipment on an offshore platform located in the Gulf of Mexico off the Louisiana coast. At that time, Ellison was employed by SSI, which was performing subcontracting work for Conoco on the outer continental shelf. Pursuant to the contract between Conoco and SSI, Ellison and a few other employees, along with a snubbing unit,[1] were sent out to Conoco's platform to complete snubbing operations on a defective oil well there. While attempting to remedy an apparent malfunction in the snubbing unit, Ellison became trapped under the jack-head of the unit, resulting in serious and permanent injuries to his back and lower extremities.
 
 
 3
 Ellison filed suit against Conoco on February 11, 1985, basing jurisdiction on the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 et seq., and alleging a cause of action for injuries under the Louisiana Civil Code, articles 2315, 2317, and 2322.[2] Through subsequent amendments to his complaint, Ellison added Associated, alleging a cause of action based on strict liability for failure to properly design, manufacture, or maintain the snubbing equipment that caused Ellison's injury, alleged to be "Unit # 2". Conoco filed a cross-claim against Associated based on the defective equipment. Aetna Casualty & Surety Company (Aetna), the insurance carrier that paid Ellison's workmen's compensation claims and medical expenses, intervened on September 27, 1985.
 
 
 4
 After protracted discovery, Associated filed a motion for summary judgment, contending that it had no ownership of and no control over the oilfield snubbing unit involved in the accident, which it identified as "Unit # 1." Ellison withdrew his initial opposition to the motion, and agreed to dismiss his complaint against Associated with prejudice. Conoco, however, continued to oppose the motion, which was nevertheless granted by the district court following a hearing. A few weeks after the hearing, on February 9, 1989, Ellison purportedly discovered "new evidence" that Unit # 2 was in fact the snubber involved in the accident, and requested permission to vacate the judgment and renew his opposition to Associated's summary judgment. On March 1, the district court granted Ellison's motion to withdraw his motion to dismiss, but denied the motion to vacate. All parties, however, were permitted to submit additional evidence on the custody issue. The summary judgment in favor of Associated was ultimately upheld by the district court on June 19, 1989. Ellison v. Conoco, Inc., 718 F.Supp. 15, 17 (E.D.La.1989).
 
 
 5
 Conoco also filed a motion for summary judgment on the issue whether it had custody or control of the snubbing unit. The district court granted this motion on January 18, 1989 insofar as it addressed strict liability under articles 2317 and 2322 of the Louisiana Civil Code. A few days before trial, Conoco reurged its summary judgment motion on the question whether it was negligent for exercising control over the SSI snubbing operations, yet failing to discover or remedy hazards in the snubbing unit. This motion was granted on July 31, 1989.
 
 
 6
 As a result of the summary judgments, trial went forward against only Conoco and solely on the issue whether Conoco negligently failed to remedy the noise hazard created by the turbine engine on the platform where the SSI crew was working. Ellison's trial presentation centered on attempting to establish that excessive noise generated by the turbine rendered him unable to hear the jack-head hydraulics in time to avoid being struck and pinned. Following the two-week trial, during which over 20 witnesses were presented, the jury returned a verdict in favor of Ellison, assessing fault at 60% on behalf of Conoco, 30% for the defective snubbing unit, and 10% on the part of Ellison, and finding Ellison's total damages to be $618,763.55. Ellison was awarded judgment for $556,887.20 (90% of $618,763.55). On September 11, 1989, Conoco filed a motion for JNOV, or alternatively, a motion for new trial, or in the further alternative, for remittitur. By order dated May 3, 1990, and entered May 4, 1990, the district court granted the JNOV motion, reasoning under Louisiana law that Conoco owed no duty to shut down the turbine engine solely on account of its noise production. The court based its analysis on a conclusion that no federal or state regulations required shut down under the circumstances existing at the time of the accident; further, that Ellison had failed to establish that the noise of the turbine in particular and above all other noise contributed to the accident.
 
 
 7
 Following the May 4, 1990 entry of the order granting the JNOV, Ellison and Aetna appealed the judgments in favor of Conoco, as well as the summary judgment in favor of Associated. Conoco also filed a notice of appeal challenging the summary judgment in favor of Associated.
 
 Discussion
 I. Appellate Jurisdiction
 
 8
 At the outset, we must address Associated's contention that this Court is without jurisdiction to hear these appeals. Associated argues that Ellison's notice of appeal,[3] which was filed May 11, 1990, after entry of the district court's order and reasons granting the JNOV (docketed May 4, 1990) but before entry of a separate document granting judgment for Conoco on that basis (docketed May 21, 1990), was premature.[4] Because Ellison filed no notice of appeal on or after May 21, 1990, Associated requests that this Court dismiss Ellison's appeal for want of jurisdiction.
 
 
 9
 Reference to the Federal Rules of Appellate Procedure does not clearly resolve this issue. Under the Rules, certain premature notices of appeal are deemed timely. See FirsTier Mortgage Co. v. Investors Mortgage Insurance Co., --- U.S. ----, 111 S.Ct. 648, 651, 112 L.Ed.2d 743 (1991). Rule 4(a)(2) provides that a notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order "shall be treated as filed after such entry and on the day thereof." However, Rule 4(a)(2) recognizes an exception in cases in which timely filing of any of several specified post-trial motions (such as a motion for JNOV) has destroyed the finality of the judgment, in such instances directing instead application of Rule 4(a)(4). The latter rule provides that "the time for appeal ... shall run from the entry of the order denying a new trial or granting or denying any other such motion" and that a notice of appeal is ineffective if filed "before the disposition of" the post-trial motion. Rule 4(a)(4) further provides that a "new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above." See also Acosta v. La. Dept. of Health and Human Resources, 478 U.S. 251, 106 S.Ct. 2876, 2877-78, 92 L.Ed.2d 192 (1986) (holding that a notice of appeal is ineffective when filed after announcement of the decision but before entry of the order on any post-trial motion referenced in Rule 4(a)(4)). The rationale behind the distinction between Rules 4(a)(2) and 4(a)(4) is made clear by the Advisory Committee's notes:
 
 
 10
 "[S]ince a notice of appeal filed before the disposition of a post trial motion, even if it were treated as valid for purposes of jurisdiction, would not embrace objections to the denial of the motion, it is obviously preferable to postpone the notice of appeal until after the motion is disposed of." Fed.R.App.P. 4(a)(4), Advisory Committee's note (1979 amendment).
 
 
 11
 If the appellant fails to timely file a notice of appeal after disposition of the post-trial motion, the appellate court lacks jurisdiction. Offshore Prod. Contractors v. Republic Underwriters, 910 F.2d 224, 229 (5th Cir.1990). The question before this Court, then, is whether entry of the district court's order and reasons granting Conoco's motion for JNOV "disposed of" the motion for purposes of Rule 4(a)(4), or whether a separate document judgment for Conoco was mandated by Rule 58 to complete the disposition of the motion for JNOV.
 
 
 12
 The parties defend their positions with conflicting interpretations of Rule 4(a)(4). Associated points to Rule 4(a)(6), which provides that a "judgment or order is entered within the meaning of this Rule 4(a) when it is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil Procedure."[5] Associated argues that, because Rule 58 mandates a separate document for entry of final judgment, the district court's JNOV was not final, or the JNOV motion disposed of, for purposes of Rule 4(a)(4), until May 21. In response, Ellison maintains that an order disposing of the motion for JNOV was entered on May 4, and the additional document docketed on May 21 was superfluous for purposes of disposing of the JNOV motion.
 
 
 13
 As we enter the murky waters of appellate jurisdiction, we first note that Rule 58 was designed to function as a life-preserver rather than a heavy anchor. See United States v. Indrelunas, 411 U.S. 216, 93 S.Ct. 1562, 1564, 36 L.Ed.2d 202 (1973). Prior to the 1963 amendment, which added the separate document requirement, courts puzzled over whether entry of an opinion that perhaps did not contain all the elements of a judgment, or was followed by a formal judgment, started the running of the appeal clock. Too frequently, injustices resulted from appellants' unsuccessful negotiation of these sometimes treacherous curves in the road to appellate jurisdiction. Therefore, the separate document requirement of Rule 58 was designed, not to create traps for the unwary, but rather to afford litigants greater certainty in establishing the time from which an appeal from a final judgment would commence to run.
 
 
 14
 Mindful of this purpose of saving appeals, many courts have been reluctant to perceive Rule 58 as imposing a universal categorical imperative. For example, the Supreme Court has held that the separate document requirement of Rule 58 may be waived, reasoning that "[c]ertainty as to timeliness ... is not advanced by holding that appellate jurisdiction does not exist absent a separate judgment." Bankers Trust Co. v. Mallis, 435 U.S. 381, 98 S.Ct. 1117, 1120, 55 L.Ed.2d 357 (1978). Following the teachings of Bankers Trust, this Court has observed that "[w]e are not required to 'mindlessly' apply Rule 58." United States v. Perez, 736 F.2d 236, 238 (5th Cir.1984). In Perez, we concluded that the separate document requirement could be met by a single document clearly disposing of the matter, reasoning that "[t]he mere fact that the first sentence of the order adopts the magistrate's report and recommendation, does not require that two documents be used by the district court rather than one." Id. at 238.
 
 
 15
 Although this Circuit has apparently not addressed precisely the situation we now face, at least one opinion illustrates that the finality of the district court's decision is determinative of whether an order disposing of the post-trial motion has been "entered." In InterFirst Bank Dallas v. FDIC, 808 F.2d 1105 (5th Cir.1987), this Court applied Perez and reasoned that because the district court's order was "succinct and to the point," and expressly granted the relief requested, it was a "document separately executed and docketed to dispose of a post-trial motion." Id. at 1109. Accordingly, we held that the time for appeal ran from the February 1, 1985 date of entry of that order, which granted a timely motion to amend a judgment previously entered on January 23, 1985; entry of an additional separate amended "judgment" document was stated not to be necessary. Id. Although Ellison relies on this decision quite heavily, it does not clearly resolve the present issue because the appellant in InterFirst Bank Dallas argued that the order was not final, and that an additional document was required. The appellant had convinced the district court to enter an amended judgment on November 15, 1985, several months after the February 1, 1985 entry of the order granting the motion to amend the January 1985 judgment. On November 17, 1985, appellant filed its notice of appeal (it had filed no notice of appeal from the February 1985 order granting the motion to amend the judgment), claiming that the November 15, 1985 document was the operative "judgment." There was no substantive difference between the January 1985 judgment as amended by the February 1, 1985 order and the November 15, 1985 amended judgment. We dismissed the appeal, concluding that the notice was filed too late, rather than too early. Id. at 1108-10. Recognizing that Rule 58 should not operate as a trap, we nevertheless concluded that neither should it be used to allow a party to cure a procedural error in observing an appellate deadline. Id. at 1108. Moreover, the November 1985 amended judgment was held to be ineffective because the time to apply for such relief had expired. Id.
 
 
 16
 Logically, Rule 4(a)(4) does not demand the formality of a judgment, but rather merely entry of an order that clearly disposes of the post-trial motion. Such action complies with the literal language of Rule 4(a)(4). Although Rule 4(a)(6) references the requirements of Rules 58 and 79(a), Rule 4(a)(6) broadly applies to judgments and orders because it governs the entirety of Rule 4(a), not just 4(a)(4). Therefore, Rule 4(a)(6) is not rendered a nullity by construing Rule 4(a)(4) as requiring only entry of an order rather than a Rule 58 judgment to complete "disposition" of a post-trial motion.
 
 
 17
 Our opinion in Jones v. Celotex Corp., 857 F.2d 273 (5th Cir.1988), cert. denied, 493 U.S. 900, 110 S.Ct. 260, 107 L.Ed.2d 209 (1989), does not mandate a different result. We held in Jones that a July 14, 1987 clerk's minute entry reflecting the district court's oral granting of a motion for JNOV was not a "final decision" for purposes of 28 U.S.C. § 1291, and thus the sole notice of appeal, filed July 16, 1987, but prior to both issuance of the district court's October 30, 1987 written opinion-order granting the motion for JNOV and its November 2, 1987 judgment, was premature. Id. at 274-75. However, we did not have occasion to pass on whether a notice of appeal filed between entry of a court's written order and entry of a separate judgment document is effective. In Jones, when the motion for JNOV was orally argued on July 8, 1987, "the district court orally granted the motion ... and advised that he would provide his written opinion later." Id. at 274. On July 14, 1987,[6] the clerk made a minute entry in the docket, without any written direction from the district court, stating "mtn for jdg notwithstanding verdict GRANTED." Id. The sole notice of appeal was filed July 16, 1987. However, there was no written order of the district court respecting the motion for JNOV, nor any written JNOV of the district court, until the October 30, 1987 and November 2, 1987 opinion-order and judgment, after neither of which was any notice of appeal filed. We held that in these circumstances "[t]he minute entry of the clerk dated July 14, 1987, did not constitute a 'final decision' " under section 1291, relying on language in Pure Oil Co. v. Boyne, 370 F.2d 121, 123 (5th Cir.1966), that " '[e]ven prior to the added requirement of Rule 58' " a clerk's " 'minute entry alone could not stand as a final judgment of the district court.' " Jones, at 275. Significantly, Jones did not even address our prior decision in InterFirst Bank Dallas, supra, which held that entry of a single written order granting a motion to amend a judgment is alone sufficient to meet the disposition requirement of Rule 4(a)(4). We therefore decline to extend Jones beyond the situation in which no written order of the court has yet disposed of the pending post-trial motion.
 
 
 18
 In the event that disposition of a post-trial motion encompassed by Rule 4(a)(4) necessitates the entry of a new final judgment, as in the case of a granted timely motion for JNOV, the procedure afforded by Rule 4(a)(2) logically applies. As noted earlier, Rule 4(a)(2) was amended subsequent to the adoption of the separate document requirement to prevent loss of the right to appeal resulting from premature filings. See Fed.R.App.P. 4(a)(2), Advisory Committee's note (1979 amendment). Rule 4(a)(4)'s exception from that saving rule was justified on two grounds: (1) that an appeal should not proceed only to be mooted by a district court's disposition of a pending motion; and (2) a notice filed before disposition of a post-trial motion could not embrace objections to the denial of the motion. See Fed.R.App.P. 4(a)(4), Advisory Committee's note (1979 amendment). However, once the district court has fully disposed of the post-trial motion in a duly docketed writing, the purposes behind Rule 4(a)(4) have been satisfied, and the rationale behind distinguishing between Rules 4(a)(2) and 4(a)(4) disappears; therefore, the language in Rule 4(a)(2) directing application of Rule 4(a)(4) ("except as provided in (a)(4) of this Rule 4") no longer has significance. See C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3950 (Supp.1991) (concluding that "[t]here is every reason for applying the wise policy of Rule 4(a)(2) once there is an actual final disposition of the [post-trial] motion"). Accordingly, we hold that once a timely post-trial motion has been granted by a duly docketed written order, and thus fully "disposed of" for purposes of Rule 4(a)(4), Rule 4(a)(2) applies to save appeals filed in the twilight zone after entry of the dispositive order and before entry of the new final judgment. Of course, where no new judgment is forthcoming, application of Rule 4(a)(2) will be unnecessary.
 
 
 19
 In summary, we believe that the clear import of our precedent and the purpose behind the Rules favor Ellison's contention that the separate document entered May 21, 1990, was not essential to complete "disposing of" Conoco's post-trial motion for purposes of Rule 4(a)(4). As in Perez and InterFirst Bank Dallas, the district court's May 4 order was "succinct and to the point," and expressly granted the full relief requested. We therefore hold that the district court's duly docketed May 4 written order and reasons "disposed of" Conoco's motion for JNOV, within the language and meaning of Rule 4(a)(4). Once Rule 4(a)(4) was satisfied and all that remained was entry of the new judgment in favor of Conoco, the appeal-saving policy of Rule 4(a)(2) operated to render the notice of appeal, if technically premature, effective. Moreover, no unfairness to Associated results from allowing the appeal to go forward, as illustrated by Associated's delay of six months (after it filed its brief, and, incidentally, shortly after Ellison filed its motion to strike portions of Associated's brief) before complaining of this alleged technical defect. Cf. Hanson v. Town of Flower Mound, 679 F.2d 497, 502 (5th Cir.1982) (holding that failure to object to lack of separate judgment document constitutes waiver of defect). In fact, until Associated filed its motion to dismiss, the May 4 order was clearly perceived to be the final disposition, as indicated by the timing of all appellants' notices of appeal.[7] Associated's motion to dismiss is accordingly denied, and we turn now to the merits of these appeals.
 
 II. Judgment Notwithstanding the Verdict
 A. Standard of review
 
 20
 This Circuit reviews a district court's decision to grant a JNOV under the now familiar standard of Boeing Company v. Shipman, 411 F.2d 365 (5th Cir.1969) (en banc).[8] In so doing, we view all the evidence in the manner most favorable to the party opposing the motion. Id. at 374. While a conflict in substantial evidence is necessary to create a jury question, a JNOV can be sustained only if we find that on all the evidence no reasonable juror could arrive at a verdict contrary to the district court's conclusion. See id. at 374-75.
 
 B. Louisiana duty-risk analysis
 
 21
 Ellison based his claim for damages allegedly caused by Conoco's negligence on article 2315 of the Louisiana Civil Code, which provides in part that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." In determining "fault" under this article, Louisiana courts apply a duty-risk analysis, which the Louisiana Supreme Court has resolved into the following three inquiries:
 
 
 22
 "(1) Was the affirmative conduct a cause-in-fact of the resulting harm?
 
 
 23
 (2) Was there a duty to protect this plaintiff from this type of harm arising in this manner?
 
 
 24
 (3) Was that duty breached?" Lejeune v. Rayne Branch Hospital, 556 So.2d 559, 566 (La.1990).
 
 
 25
 The district court concluded that Ellison's case was lacking with respect to both the first and second elements enumerated in Lejeune. The court initially found that Ellison had presented "no evidence of the exact levels of noise on the platform, or the levels of noise created by the platform's turbine compressor versus the noise created by the snubbing unit's diesel engine...." The court further concluded that, assuming Conoco's noise did lead to Ellison's injury, the lack of duty to shut down the turbine engine on the platform was dispositive. The court noted that no federal or state rules or regulations required turbine shut down to reduce noise levels. The court also determined that Conoco's safety manual did not require shutdown in anticipation of the type of harm suffered by Ellison; i.e., injury resulting from a party being struck by defective snubbing equipment or from high noise levels masking safety warnings, rather than injury due to fire or explosion, the likelihood of which is increased by continuing production during other operations that allow release of flammable gases into the surrounding atmosphere. Because the court concluded that Conoco had no duty to reduce noise levels solely to offset the risk of injury from defective snubbing equipment or the masking of safety warnings, it determined that the jury's finding of breach of duty was unreasonable. Accordingly, Conoco's motion for JNOV was granted. Ellison challenges both the conclusion of no duty, as well as the determination that no evidence was presented regarding noise levels on the platform.
 
 
 26
 (1) Causation-in-fact
 
 
 27
 The causation-in-fact issue requires a determination of whether there is substantial evidence that the noise levels from Conoco's turbine engine prevented Ellison from hearing the jack-head hydraulics in time to avoid impact.[9] Ellison argues that he submitted sufficient evidence for the jury to find causation-in-fact. Specifically, Ellison cites the trial testimony of three SSI employees who claimed to have heard the turbine over all other noise and complained to Conoco regarding the turbine noise.
 
 
 28
 In response, Conoco first submits that the snubbing unit itself was noisy, and condemns Ellison's failure to break down the noise on the platform according to source. Further, Conoco points out that Ellison was able to communicate orally to a co-worker just prior to the accident, and argues that thus the noise levels could not have been too high.[10] Conoco dismisses the contrary testimony of Ellison's co-workers, characterizing that testimony as tainted by the witnesses' friendship with Ellison. Finally, Conoco argues that, even if the turbine was noisy, the jack-head may have moved before making noise, eliminating the chance of avoiding impact. This point was made at trial by the testimony of James Williams, the designer and builder of the snubbing equipment in question. Extending that point, Conoco additionally asserts that Ellison did not need to rely on audio cues because he admittedly had visual and physical contact with the equipment before its malfunction.
 
 
 29
 Although Conoco's arguments have a certain logic, we conclude from the record as a whole that the jury was presented with sufficient evidence from which it could reasonably find that the turbine noise prevented Ellison from hearing the jack-head begin its descent. Ellison and his co-workers each testified that the noise interfered with their ability to respond to the equipment. Conoco's contrary evidence was not so overwhelming that reasonable minds could not differ. Furthermore, as to Conoco's claims of bias, such a matter is always or almost always one for jury resolution. See United States v. Lindell, 881 F.2d 1313, 1322 (5th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990).
 
 
 30
 (2) Duty
 
 
 31
 Although we conclude that Ellison carried his burden of creating a jury issue on whether the noise of Conoco's turbine engine caused his injury, we agree with the district court that the duty portion of our analysis is fatal to Ellison's negligence claim.
 
 
 32
 In Louisiana, the existence of a duty is a question of law, and similarly, the question whether a particular risk of harm is included within the scope of a particular duty is a legal issue to be resolved by the court. Dillon v. Louisiana Power and Light, 557 So.2d 293, 295 (La.App. 4th Cir.1990). Duty is usually defined as "the obligation to conform to the standard of conduct of a reasonable man under like circumstances." Seals v. Morris, 410 So.2d 715, 718 (La.1981). In determining the existence of a duty, Louisiana courts have typically recited that whether a legal duty is owed by one party to another "depends on the facts and circumstances of the case and the relationship of the parties." See id. In addition, a "crucial issue" recently relied on by the Louisiana Supreme Court in its duty analysis is the foreseeability of the risk of harm. Brown v. Tesack, 566 So.2d 955, 957 (La.1990).
 
 
 33
 The district court concluded that, because it found no legal precedent or regulation requiring a platform owner to shut down production in order to reduce noise levels, therefore Conoco owed no such duty to Ellison. However, as Ellison aptly notes, "negligence does not solely depend on violation of a statute or rule." Southern Natural Gas Co. v. Gulf Oil Corp., 320 So.2d 917, 919 (La.App. 3d Cir.1975), cert. denied, 324 So.2d 812 (1976) (emphasis in original).
 
 
 34
 Conoco places great emphasis on its interpretation of its own safety manual, which it claims required shutting down the turbine only to prevent fire, explosion, or damage to hearing from excessive noise. No duty was imposed, Conoco contends, to shut down production to prevent injury from defective snubbing equipment or masking warning sounds; moreover, Conoco asserts that no duty should be imposed because such an accident is not a foreseeable result of a noisy turbine. Although Conoco has a point with respect to foreseeability, cf. Tesack, 566 So.2d at 957 (imposing liability for foreseeable harm), it cannot seek solace in its own safety manual if the rules therein are themselves unreasonable. See Southern Natural Gas Co., 320 So.2d at 919.
 
 
 35
 Ellison also places emphasis on the Conoco safety manual, which he claims did require the turbine to be shut down prior to the accident. Ellison testified at trial that he was performing wireline operations on a "live" well, and that the Conoco safety manual requires shut downs under those conditions. Even if Ellison is correct, he ignores a critical point in duty-risk analysis; namely, whether the defendant's duty to the victim includes protection against the particular injury. Sibley v. Gifford Hill and Co., 475 So.2d 315, 319 (La.1985). Undisputed trial testimony established that running the turbine presents an enhanced risk of fire or explosion when wireline operations are conducted on a "live" well (with likely release of flammable gases into the surrounding atmosphere), and that it was to protect against this risk that the safety manual required shut down under such conditions. However, Ellison's injury resulted from his inability to respond to an audible warning signal and avoid malfunctioning equipment, and no evidence at trial even suggested that such a mishap was within the risk contemplated by the Conoco safety regulations.
 
 
 36
 Thus, Conoco's safety manual appears to be a red herring for both parties. We direct our focus instead to the traditional "reasonable person" standard to determine whether Conoco owed Ellison a duty to shut down the turbine in order to control noise so that equipment safety signals would not be masked. See Seals, supra, 410 So.2d at 718. Viewed in the light most favorable to the jury's verdict, Ellison's trial evidence indicated three things: (1) that the turbine was loud, (2) that the SSI workers complained to Conoco about the loud noise, and (3) that the workers felt it was important to be able to hear their equipment operate. However, Ellison failed to present any evidence that any of the SSI workers ever connected these points for Conoco's benefit prior to the accident. In other words, the trial testimony failed to establish that it had ever been suggested to Conoco that the turbine noise rendered the snubbing crew materially less able to hear critical audio cues from their equipment (or otherwise). Rather, the evidence indicated that the snubbing workers relayed to Conoco a dislike of the noise solely because its intensity was unpleasant; responding to such complaints, both Conoco and SSI required ear protection in high noise areas.[11] Such a requirement establishes that Conoco (and SSI) did not anticipate reliance on audio cues, but rather expected just the opposite; otherwise, a further impediment to receipt of the audio cues would not have been required, and welcomed by the crew. Further, Ellison himself testified that he had physical and visual contact with the machine shortly before impact, which was apparently part of normal procedures. Under the undisputed evidence, in the absence of a specific complaint from the SSI crew, Conoco had no reason to anticipate that the workers would need to also rely on audio cues in addition to visual and physical stimuli.
 
 
 37
 In sum, the unfortunate injury that befell Ellison was simply not, from Conoco's standpoint, a foreseeable result of the continued operation of the turbine engine. The district court thus correctly determined that Conoco was under no duty at the time of Ellison's accident to discontinue the engine's operation. The district court's entry of JNOV in favor of Conoco is accordingly affirmed.[12]
 
 
 38
 Because we have affirmed the JNOV, we find that the district court's failure to rule on Conoco's alternative motion for new trial, as required by Fed.R.Civ.P. 50(c),[13] constitutes at most harmless error. Cf. Normand v. Research Institute of America, Inc., 927 F.2d 857, 865-66 (5th Cir.1991) (reading district court's ruling on JNOV as inferential denial of new trial). Although the better practice clearly would have been for the district court to expressly rule on Conoco's alternative new trial motion, in our view a remand in this case would only waste valuable judicial resources. But see Nodak Oil Co. v. Mobil Oil Corp., 526 F.2d 798, 799 (8th Cir.1975) (remanding for ruling on conditional motion for new trial before reaching merits of appeal), rev'd on other grounds after remand, 533 F.2d 401 (1976).
 
 III. Summary Judgments
 A. Standard of review
 
 39
 Our review of the district court's ruling on the motions for summary judgment is plenary. Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167, 177 (5th Cir.1990). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In our evaluation we are constrained to view the facts and inferences from the evidence in the light most favorable to the nonmoving party. Lavespere, 910 F.2d at 178.
 
 
 40
 B. Summary judgment in favor of Conoco: Custody and control
 
 
 41
 As an alternative to overturning the JNOV in favor of Conoco, Ellison argues that the district court improperly granted summary judgment for Conoco on the issue whether Conoco exercised custody and control over the SSI snubbing unit. Ellison relies on Futo v. Lykes Bros. S.S. Co., Inc., 742 F.2d 209, 214 (5th Cir.1984), in which this Court stated that if an employer of an independent contractor retains control over the "operative details" of the contractor's work, the employer has an affirmative duty to protect the employees of the contractor from injury. See also, Ewell v. Petro Processors of Louisiana, Inc., 364 So.2d 604, 606-07 (La.App. 1st Cir.1978), writ denied, 366 So.2d 575 (1979).
 
 
 42
 In connection with the summary judgment motion, the parties offered conflicting versions of the nature of the arrangement between SSI and Conoco. Ellison cited deposition testimony in support of his assertion that Conoco controlled the "operative details" of SSI's snubbing operations. In particular, the SSI supervisor testified at his deposition that the Conoco representative habitually discussed procedure with the SSI crew, and that at certain points SSI would have to check with the representative before proceeding further. Conoco, in response, cited the snubbing contract between SSI and Conoco, which contained several clauses clearly providing that SSI was an independent contractor, that SSI was to procure insurance to cover injuries to SSI's employees, and that SSI assumed full responsibility for loss or damage to its material, machinery, equipment, or other property while performing under the contract. Conoco further cited deposition testimony of several witnesses reflecting that Conoco did not control the snubbing operations.
 
 
 43
 An employer (such as Conoco) generally has no duty to ensure that an independent contractor performs its obligations in a safe manner. McCormack v. Noble Drilling Corp., 608 F.2d 169, 174-75 & n. 9 (5th Cir.1979); Robideaux v. Hebert, 118 La. 1089, 43 So. 887, 889 (1907). However, an employer who retains control over the "operative details" of the independent contractor's work has a duty to discover or remedy hazards created by the contractor. Hawkins v. Evans Cooperage Co., 766 F.2d 904, 906 (5th Cir.1985) (applying Louisiana law). The rationale behind the control exception to the general rule of nonliability is based on a recognition that
 
 
 44
 "one has an affirmative responsibility toward others when one has taken an active part in directing the manner in which those others perform their tasks or when one creates or is generally responsible for a dangerous situation that causes harm." Futo, 742 F.2d at 215.
 
 
 45
 The facts of this case are similar to the situation we faced in Wallace v. Oceaneering Int'l, 727 F.2d 427, 437 n. 7 (5th Cir.1984). In attempting to define the concept of control, we relied on the Second Restatement of Torts, which provides:
 
 
 46
 "It is not enough that [the employer] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.... There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, comment c (1965).
 
 
 47
 We then concluded that the employer's representative had no actual control over the contractor's work, but merely the right to inspect its progress. Moreover, although the employer's company man had been in the vicinity where the plaintiff had been injured, there was no evidence that he had controlled the operation of the procedure in which the plaintiff was injured. In particular, no evidence indicated that the representative had been aware that defective equipment was being used. Id. at 437. Accordingly, we held that the well owner was entitled to a directed verdict. Id.
 
 
 48
 As in Wallace, the summary judgment evidence before us clearly demonstrates that Conoco did not exercise the degree or type of control necessary to hold it responsible for Ellison's tragic encounter with the defective snubbing equipment. No evidence suggests that Conoco ever inspected or tested the snubbing equipment; rather, the evidence indicates that Conoco merely monitored the operation and specified the work it wanted done. Although the Conoco company man could have ordered the work stopped if he observed an obviously dangerous situation, inspections of equipment and the choice of safe snubbing methods were understood by all to be the responsibility of SSI. Accordingly, the summary judgment in favor of Conoco on this point is affirmed. Wallace.
 
 
 49
 C. Summary judgment in favor of Associated: The concept of garde
 
 
 50
 In his second amended complaint, Ellison alleged that the snubbing unit involved in the accident was defective in its manufacture and design and that Barnett Industries (Associated's predecessor) was strictly liable under Louisiana Civil Code article 2317 for Ellison's injury. However, the district court found that there was no evidence that Associated had custody over the snubbing unit for purposes of article 2317 liability, and accordingly granted Associated's motion for summary judgment.
 
 
 51
 Ellison and Conoco join in arguing that the district court improperly granted summary judgment to Associated. Associated defends its position now, as it did below, by arguing that it had no interest in Unit # 1, the unit it claims was involved in the accident; further, even if Unit # 2, which Associated admittedly owns, was involved in the accident, Associated asserts that it did not have custody over that unit because it was leased to SSI. In the alternative, Associated argues that Unit # 2 was not defective, but was rather improperly maintained by SSI. For the purposes of this appeal, we will assume there was evidence that Unit # 2 was the unit that injured Ellison.
 
 
 52
 The undisputed facts show that SSI both designed and manufactured Unit # 2 to completion in 1979. Due to capitalization problems, SSI later entered an arrangement with Associated in which Associated purchased the equipment but immediately leased it back to SSI (an arrangement commonly termed a "sale-leaseback"). SSI used the unit in its snubbing operations until dissolution of the business in 1985. At no time, however, did the unit physically change hands; rather, the transfer of ownership was strictly a financing arrangement similar to a lien. Because there was no transfer of possession, the district court found that Associated never had custody of the unit, and thus could not be held strictly liable for its defects.
 
 
 53
 Ellison's strict liability claim against Associated is based on Louisiana Civil Code article 2317, which provides: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." Consistent with Louisiana's French civil law heritage, the Louisiana Supreme Court has held that "custody" under this article must be interpreted in compliance with the French legal concept of garde. Ross v. La Coste de Monterville, 502 So.2d 1026, 1029-30 (La.1987). According to the French understanding, garde is the obligation imposed by law on the proprietor of a thing, or on the one who avails himself of it, to prevent the thing from causing damage to others. Id. In the actual application of French law, the garde of a thing is divided between the guardian of the conduct of the object, who is responsible for damage caused by the object's behavior, and the guardian of the object's structure, who is responsible for damage caused by the object's defects. Ross, 502 So.2d at 1030. Article 2317 embraces only the second component. Id. at 1032. Because article 2317 imposes strict liability, the injured plaintiff need not prove the guardian's knowledge of the defect prior to the accident.
 
 
 54
 Ellison and Conoco argue that physical possession is not a necessary component of garde. In support of their argument, Ellison and Conoco cite several cases that address whether an owner of a thing who has custody transfers the garde by transferring possession. See, e.g., Lucas v. Deville, 526 So.2d 1264, 1267 (La.App. 3d Cir.1988) ("An owner of an object, who transfers its possession, but not its ownership to another, continues to have garde or custody of its structure, and is obliged to protect others from damage caused by structural defects arising before the transfer.") (emphasis added); Detillier v. Safco, Ltd., 507 So.2d 829, 831 (La.App. 5th Cir.), writ denied, 508 So.2d 820 (1987) ("The guardianship or custody of a thing from which liability arises under article 2317 rests with the owner, until such time as it is transferred to another."); Ross, supra, 502 So.2d at 1029 ("An owner who transfers to another possession of his thing containing a structural defect continues to have the garde or custody of its structure and a duty to protect others from harm caused by the defect.") (emphasis added).
 
 
 55
 The unifying element in the cases finding garde to remain in the owner, though he lacks physical custody of the thing, is a transfer of physical possession from the owner to another. The rationale behind this requirement is reflected in the policy behind the concept of garde:
 
 
 56
 "[T]he owner of a thing is in a better position than the innocent victim to guard against the unreasonable risks of structural defects in the thing he owns which arise before he transfers possession of it to another." Ross, 502 So.2d at 1032.
 
 
 57
 Thus, a clear assumption in the concept of garde is that legal title and physical possession were once vested simultaneously in the entity having garde. We find the cases cited by Ellison and Conoco to be inapposite because at no time did Associated have physical possession over Unit # 2; thus, Associated never performed the critical act of transferring possession to SSI. Because Associated never possessed, controlled, or operated Unit # 2 (and had no part in its design or manufacture), it follows that Associated was therefore never in a position to correct defects that might have arisen.
 
 
 58
 In summary, our analysis of Louisiana law leads us to the inescapable conclusion that Associated did not acquire garde over Unit # 2 merely by virtue of entering into a sale-leaseback arrangement with SSI. With respect to the factors relevant to garde, no change of substance was effected by the sale-leaseback, and these factors remained with SSI, which continued to have the unit's garde. The district court's summary judgment in favor of Associated is accordingly affirmed.[14]
 
 Conclusion
 
 59
 For the reasons stated, the judgment of the district court is, in all respects,
 
 
 60
 AFFIRMED.
 
 
 
 *
 Circuit Judge of the Eighth Circuit, sitting by designation
 
 
 [1]
 A snubbing unit is a hydraulic-mechanical device that is designed to perform "workover" operations on malfunctioning oil wells. The procedure involves sealing a defective oil well while repairs to the well are effected
 
 
 [2]
 The OCSLA provides that state law shall apply as surrogate federal law to the extent that it is applicable and not inconsistent with other federal laws and regulations. 43 U.S.C. § 1333(a)(2). The OCSLA further provides that the state selected is that adjacent to the offshore area. Id. Neither party disputes that the law of Louisiana governs Ellison's claims
 
 
 [3]
 References to Ellison and his notice of appeal are intended to include Aetna
 
 
 [4]
 Ellison's first notice of appeal was filed September 19, 1989, before the district court acted on Conoco's motion for JNOV. In an unpublished opinion, we dismissed that appeal as untimely. Ellison v. Conoco, Inc. et al., No. 89-3645 (5th Cir.1990)
 
 
 [5]
 Federal Rule of Civil Procedure 58 provides, in relevant part:
 "Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)."
 Rule 79(a) directs the clerk of the court to maintain a "civil docket," and to record all case activities on that docket, particularly noting the date of entry of judgments and orders.
 
 
 [6]
 At one place Jones refers to this date as July 14, 1988, an obvious typographical error
 
 
 [7]
 Ellison and Aetna each filed a notice of appeal prior to May 21; Conoco filed its cross-appeal on May 21, before it could have known that the separate "judgment" document would be docketed the same day
 
 
 [8]
 Although the OCSLA provides for application of Louisiana law in this case, the federal standard for sufficiency of the evidence controls to the extent that the Louisiana standard differs. See Superior Oil Co. v. Transco Energy Co., 616 F.Supp. 94, 95 (W.D.La.1984) (applying federal standard on the question of issuance of preliminary injunction to the extent Louisiana law is inconsistent); see also Martin v. American Petrofina, Inc., 779 F.2d 250, 251 (5th Cir.1985) (applying federal standard for review of JNOV in diversity action), modified on other grounds, 785 F.2d 543 (1986); Boeing Company v. Shipman, 411 F.2d at 368-70 (same)
 
 
 [9]
 At trial, Ellison analogized the sounds emitted from the jack-head hydraulics to the hissing sound brakes on a city bus make. This hissing sound, contended Ellison, provides a critical audio cue alerting the operator to the impending movement of the jack-head
 
 
 [10]
 Ellison testified that when the jack-head evidenced a malfunction, a co-worker attempted repairs. Unsatisfied with that worker's progress, Ellison told him to get out of the way and to retrieve some tools so that Ellison could work on the machine himself. The accident occurred shortly after Ellison took over
 
 
 [11]
 Ellison himself testified that the complaint about the noise centered on potential danger to the workers' hearing, and that the SSI crew wore earplugs "for our own safety, you know, for the hearing factor.... [The engine] hampered our hearing. It didn't allow us to do our job, so it was, you know, our choice that, you know, in order to save our hearing" (emphasis added). At no point did Ellison testify that he or any member of the SSI crew suggested to Conoco that the noise impeded their ability to work with their equipment
 
 
 [12]
 Ellison further argues that the district court's refusal to allow him to call Holly McCann, the Conoco representative stationed on the platform, as a rebuttal witness, or to introduce McCann's deposition in lieu of live testimony, unfairly prejudiced his case. However, the district court is vested with broad discretion in evidentiary matters, see Jon-T Chemicals, Inc. v. Freeport Chemical Co., 704 F.2d 1412, 1417 (5th Cir.1983), and because the fault in failing to call McCann during Ellison's case-in-chief rests with Ellison, we are unable to conclude that this discretion was abused
 
 
 [13]
 Rule 50(c) provides that "(1) [i]f the motion for judgment notwithstanding the verdict ... is granted, the court shall also rule on the motion for a new trial...." The theory behind this rule is that if the JNOV is later reversed on appeal, the case on remand will be governed by the trial judge's award of a new trial. Montgomery Ward and Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 196, 85 L.Ed. 147 (1940)
 
 
 [14]
 Ellison has presented a motion seeking to strike portions of Associated's brief on appeal. During the briefing process, Associated requested permission from this Court to supplement the record on appeal with excerpts from depositions of James Williams, SSI, and Associated. On October 30, 1990, this Court denied the motion to supplement, subject to reconsideration by this panel. Nevertheless, Associated submitted its brief containing multiple references to materials not part of the record
 Inasmuch as the motion has been carried with the case and it is well within this Court's abilities to simply ignore the impertinent portions of Associated's brief, granting Ellison's motion to strike at this point will serve no useful purpose, and it is accordingly denied.