653 So.2d 83 (1995)
Jacob R. TOUCHET, et al., Plaintiffs-Appellants,
v.
ESTATE OF Constance M. BASS, et al., Defendants-Appellees.
No. 94-1159.
Court of Appeal of Louisiana, Third Circuit.
March 22, 1995.
Writ Denied June 2, 1995.
*84 James Paul Lambert, Lafayette, for Jacob R. Touchet et al.
Raymond C. Jackson, III, Lafayette, for Estate of Constance M. Bass, et al.
Andrew Duke McGlathery, III, Lake Charles, for Edward F. Bass.
Skipper M. Drost, Sulphur, for Stine Lumber Co.
Rick J. Norman, Lake Charles, for L.L. Brewton Lumber Co. & Westchester.
James E. Diaz, Lafayette, for Deltic Farm & Timber Co.
William J. Hamlin, New Orleans, for Intern. Paper Co.
Before DOUCET, C.J., and KNOLL and SAUNDERS, JJ.
DOUCET, Chief Judge.
The plaintiffs, Jacob, Claudia, Shannon and Stacy Touehet, appeal the trial court's dismissal of their claims against the defendants, the Estate of Constance Bass, Edward F. Bass and John Colden Bass (the Bass family) pursuant to a motion for summary judgment.
In 1990 or 1991, while her husband was in his final illness, Constance Bass bought property in Lake Arthur, Louisiana and moved a house onto it to serve as a vacation home or camp. She contacted Clyde Guidry, a carpenter, to renovate the house for that purpose. Mrs. Bass told Guidry what she wanted and he did the work. When he needed help, he contacted additional independent carpenters. In 1991 Mrs. Bass' sons built part of a wharf or pier. In late 1991 or early 1992, pilings were driven for the remainder of the pier and for a boathouse. This work was done by an unidentified contractor who is not involved in this suit. In early 1992, the Bass brothers fastened 2 X 12 boards to the pilings so that a walkway could be laid on top. Clyde Guidry laid the walkway in April or May 1992.
By this time Mrs. Bass was terminally ill with cancer. However, she decided to have the boathouse and a deck built. She and her son, Edward Bass, discussed what she wanted the boathouse to look like. She told her son to contact Clyde Guidry to do the work. Edward Bass met Clyde Guidry and explained his mother's plan for the boathouse and deck. He told Guidry to use all treated materials and to put on a tin roof. A few days later work was started. Guidry was apparently in touch with a pool of independent carpenters with whom he frequently worked. One of these men was the plaintiff, Jacob Touehet. Several men who were then working with him on another project moved to the Bass project. Each carpenter kept his own hours and gave them to Guidry. Guidry submitted the hours to Edward Bass. A check for each man was sent to Guidry, who distributed them to the carpenters. Guidry decided what materials were needed and charged them to the Bass' account at Stine Lumber. The invoices were then paid from Mrs. Bass' checking account as the bills came in. In his deposition, Edward Bass said that *85 he did not remember telling Guidry to do this but that Guidry probably knew about it from the previous jobs done for the family.
Touchet began work on the Bass project but, after a few days, moved to another project in which Guidry was also involved. After two or three weeks, he moved back to the Bass job on May 18, 1992. He was instructed by Lester Guidry, another carpenter and a cousin to Clyde Guidry, to help install a large piece of exterior plywood on the south side of the boat house over the water. Scaffolding had been built of 2 X 6 lumber from Stine Lumber so that work could be done. Touchet and another carpenter, Toby Matt, climbed onto the scaffolding. Other men handed them a piece of plywood. As Touchet and Matt were positioning the board, a 2 X 6 that was acting as a brace for the scaffolding broke. The scaffolding collapsed. The two men fell in the water. The plywood fell on Touchet's right leg. Ultimately, Touchet underwent amputation of the leg.
As a result of the accident, Touchet, his wife and two sons brought this action against the Estate of Constance Bass, Edward F. Bass, John Colden Bass, Stine Lumber Company, L.L. Brewton Lumber Company (Brewton), who allegedly treated the lumber, and several mills who allegedly supplied lumber to Brewton. The suit alleged that the Bass family was liable under the strict liability provisions of La.C.C. art. 2317.
It was discovered that the 2 X 6 that broke causing Touchet's fall was discarded after the accident in routine cleanup of the job site. As a result, it was impossible to discover which mill supplied the lumber to Brewton. Therefore, the mills were dismissed pursuant to motions for summary judgment.
On July 6, 1994, the Bass family moved for summary judgment alleging that they did not have custody of the lumber as required to establish liability under La.C.C. art. 2317. Following a hearing, the trial court granted the motion. Judgment was rendered dismissing the Bass family from the suit. Stine Lumber and Brewton remain as defendants. The plaintiffs appeal the dismissal of the Bass family.
On appeal the plaintiffs argue that the trial court erred in finding that there was no genuine issue of fact whether the Bass family had custody or garde of the lumber for the purpose of liability under La.C.C. art. 2317.
La.C.C. art. 2317 provides in pertinent part that:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody...."
Custody under this article must be interpreted in compliance with the French concept of garde. Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987), as cited in Ellison v. Associated Oilfield Services, Inc., 950 F.2d 1196 (5th Cir.1992).
"According to the French understanding, garde is the obligation imposed by law on the proprietor of a thing, or on the one who avails himself of it, to prevent the thing from causing damage to others. [Ross v. La Coste de Monterville, 502 So.2d 1026 (La.1987)] In the actual application of French law, the garde of a thing is divided between the guardian of the conduct of the object, who is responsible for damage caused by the object's behavior, and the guardian of the object's structure, who is responsible for damage caused by the object's defects. Ross, 502 So.2d at 1030. Article 2317 embraces only the second component. Id. at 1032. Because article 2317 imposes strict liability, the injured plaintiff need not prove the guardian's knowledge of the defect prior to the accident."
Ellison v. Associated Oilfield Services, Inc., supra. at 1208. See also Franklin v. Ford Motor Corp., 617 So.2d 57 (La.App. 4 Cir.), writ not considered, 619 So.2d 565 (La.1993).
The Touchets argue that, as owners of the lumber, the Bass family was presumed to have the garde. This court in Mayo v. Nissan Motor Corp. in U.S.A., 93-852 (La.App. 3 Cir. 6/22/94); 639 So.2d 773, 787 cited Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461 (La.1991) for the proposition that "[a]lthough ownership creates the presumption of garde, this presumption is rebuttable *86 by the owner. Id. Whether the law imposes a duty ofgarde is a factual inquiry. Id."
Since the question of garde is factual, summary judgment will be appropriate under La.C.C.P. art. 966, only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that" the Bass family did not have garde of the lumber, and that they were "entitled to judgment as a matter of law."
This court has stated in Green v. Popeye's Inc., 619 So.2d 69, 72 (La.App. 3 Cir.1993) that:
"... Although the general rule is that an owner of a building under construction does not have custody of the building, Louisiana jurisprudence has recognized an exception to this rule where the owner exercises control over the contractor's methods of operation. Williams v. Gervais F. Favrot Co., 499 So.2d 623 (La.App. 4 Cir.1986), writ denied 503 So.2d 19 (La.1987), Herron [v. Lincoln Property Co., 525 So.2d 1189 (La.App. 5 Cir.1988)].
However, when the owner furnishes the plans and specifications and retains only the right to inspect the job site to insure that the job is being performed in accordance with the specifications, he does not have operational control over the contract work. Massey v. Century Ready Mix Corp., 552 So.2d 565 (La.App. 2 Cir.1989), writ denied 556 So.2d 41 (La.1990). Herron, supra."

The plaintiffs allege that the deposition testimony shows that the Bass family had garde of the lumber because a member of the family was acting as the general contractor on the boathouse project. In support of this, the Touchets cite the direct payment to the carpenters from Mrs. Bass' checking account, the fact that the materials were charged to the Bass' account at Stine Lumber, and the fact that the bills from Stine Lumber were paid by the Bass family. They further rely on Mrs. Bass' supervision of the renovation of the house and her specification of the size and type of boathouse to be built. Additionally, they argue that Edward Bass' participation in the building of the wharf shows supervision of the boathouse project.
The testimony of Bass was that he gave the specifications for the boathouse to Clyde Guidry and told him to use treated lumber and a tin roof. He said that he left the decisions about how to achieve the desired end to Guidry. Bass further testified that he visited the building site to see how the work was coming. He testified that his first visit was after Touchet's accident, because that is when he found out about it. He said that he did not have anything to do with supplies, equipment or the choice of laborers to help Guidry. He did not help build the boathouse. He conceded that the men were paid directly from his mother's account and that the Stine bills were paid as they came in. Clyde Guidry's deposition testimony was also introduced in support of the motion for summary judgment. He said that he is an independent carpenter doing mostly residential carpentry. If he needs help on a job he finds laborers. However, it is his policy to have the client pay each worker directly. On the Bass boathouse job, each man kept his time and turned it in to Guidry at the end of the week. He then sent the time to the Basses. They sent the checks for all the laborers to him and he distributed them. Each laborer does his own withholding. He stated that Ed Bass contacted him to build the boathouse. He met with Edward Bass and several days later started work. He did not recall ever seeing any of the Bass family at the building site. He ordered all the materials. Either he, Lester Guidry, Jacob Touehet, or Galvin McGee would accept the materials and check to be sure the right things had been delivered. Guidry testified that none of the Bass family ever received materials. He said that when he was on the job site, he was in charge and that when he was not on the job, Lester Guidry was in charge.
Lester Guidry's deposition was also introduced in support of the motion for summary judgment. He said that he was an independent carpenter. He said he had worked on construction jobs in cooperation with Clyde Guidry off and on for three years. He worked on the Bass' boathouse with Clyde Guidry. Lester Guidry testified that when the job began there was no lumber remaining on the site from the previous work. He said *87 that while he was on the job Ed Bass came to the job site once or twice with a design change. No other member of the family came to the job site while he was there, that is, on weekdays. No member of the Bass family received lumber. He had no contact with the Bass family except through Clyde. None of the Bass family told them how to build the boathouse. They said what they wanted done and left it at that. While both he and Clyde were drawing the same pay, Clyde was the head man on the job. Clyde said what he wanted done and Lester did it.
This testimony establishes that the Bass family did not have operational control over the construction of the boathouse.
The Touchets argue that the Green case is distinguishable because in that case there was a contract that regulated the relationship between the owner and the contractor. In this case, they argue, because there was no contract, the Bass family retained the right to control the project. This is not an accurate interpretation of the Green holding. The language cited by the Touchets in support of this argument is as follows: "A review of the testimony and the contract between Dixiefoods and Miciotto reveals that Dixiefoods did not exercise control over Miciotto's methods of operation and thus did not have custody of the building." (Emphasis added.) This court in Green did not rely only on a written contract between the parties. Nor is there anything in Green to show that a contract, written or otherwise, is necessary to establish that an owner does not have operational control. Further, the record here shows that a contract, albeit verbal, did exist. We know of nothing that would prevent the parties from entering a verbal contact concerning the construction of the boathouse. Here, although Clyde Guidry testified that there was no contract, the record as a whole indicates that the parties had reached a verbal agreement that controlled their relationship and the operation of the construction project.
We can find no jurisprudence to indicate that a right to control is the determining factor with regard to garde. The language of Green indicates that it is the exercise of control that is the determining factor. Our reading of the jurisprudence has convinced us that the feature that distinguishes those cases where an owner was found to have garde from those cases where an owner was found not to have garde is physical possession, not a right to control. As the court stated in Ellison, supra., at p. 1209:
"The unifying element in the cases finding garde to remain in the owner, though he lacks the physical custody of the thing is a transfer of physical possession from the owner to another. The rationale behind this requirement is reflected in the policy behind the concept of garde:

`[T]he owner of a thing is in a better position than the innocent victim to guard against the unreasonable risks of structural defects in the thing he owns which arise before he transfers possession of it to another.' Ross, 502 So.2d at 1032.
Thus, a clear assumption in the concept of garde is that legal title and physical possession were once vested simultaneously in the entity havinggarde."
The record in this case clearly establishes that the Bass family never had physical possession of the lumber that caused Mr. Touchet's unfortunate fall. Accordingly, no issue of material fact remains but that the Bass family never had garde of the lumber. This reasoning applies equally to the Estate of Constance Bass and to the Bass sons as heirs of their father. As a result, we need not reach the question of whether the camp was the separate property of Constance Bass. Therefore, the trial court correctly granted the motion for summary judgment.
The trial court's judgment dismissing the claims against the Bass family is affirmed at the plaintiffs' cost.
AFFIRMED.
SAUNDERS, J., dissents and assigns written reasons.
SAUNDERS, Judge, dissenting.
To obtain damages under LSA-C.C. art. 2317 against the landowners, plaintiff must show (a) that the defective board causing the damage was in the care (custody) of the *88 defendant-owner, (b) the defect or vice of the board, and (c) that his damages occurred through this defect or vice. Loescher v. Parr, 324 So.2d 441 (La.1975). Because conditions (b) and (c) have been met in this case, this dispute solely concerns the question of who had garde of the defective board.[1] In my view, considerable uncertainty persists as to whom between the Bass Estate as owner (or self-contractor), and the potentially independent contractor had garde of the defective board and scaffolding into which the board was incorporated.
In most cases, the custodian is the owner of the thing, as he is the person who has actual control of the thing or at least is held responsible for the thing because he has the use and benefit of it. Fonseca v. Marlin Marine Corp., 410 So.2d 674, 679 (La.1981) (n. 8 and accompanying text) (owner responsible for poor scaffolding in barn). Thus, when a LSA-C.C. art. 2317 claim is launched, the owner, that is, the party possessing "the right that confers on a person direct, immediate, and exclusive authority over a thing," is presumed to have garde. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991).
Although ownership creates the presumption of garde, this presumption is rebuttable by the owner. To rebut its presumption of garde, however, a reviewing court must determine (1) what benefit the owner received from the defective thing (2) what kind of direction and control it had over it. Id. Whether the law imposes a duty of garde upon the owner is a factual inquiry, Doughty, Id., citing King, 543 So.2d at 1330 and Kent, 418 So.2d at 497.
The record does not dispositively indicate that the owner's relinquished the right to go out on the job and give instructions, nor that they transferred control of the job site, nor that control was not shared between them and an alleged independent contractor. See Faul v. Bank of Sunset & Trust Co., 635 So.2d 573, 578 (La.App. 3d Cir.1994). There is no evidence to suggest how independent the purported independent contractor was, nor whether the entire job was performed for a set price, and these are two vital considerations in determining responsibility in this case. See Williams v. Gervais Favrot Co., 499 So.2d 623, 625 (La.App. 4th Cir.1986), writ denied, 503 So.2d 19 (La.1987). Clearly, this is not a situation where the owner never had custody of the work site, nor a "turn-key" project where the owner's responsibilities are limited to providing job specifications, thus transferring garde. Cf., Herron v. Lincoln Property Co., 525 So.2d 1189, 1190-91 and n. 2 (La.App. 5th Cir.1988).[2]
Thus, the question persists: to what extent did the Basses relinquish control? See, generally, Green v. Popeye's, Inc., 619 So.2d 69, 73 (La.App. 3d Cir.1993); Massey v. Century Ready Mix Corp., 552 So.2d 565, 576 (La.App.2d Cir.1989), writ denied, 556 So.2d 41 (La.1990).
Summary judgments are no substitute for judgment on the merits regardless of the likelihood that the party opposing the motion for summary judgment will ultimately prevail, and here it would be unwise to unnecessarily preclude further development of the facts concerning the relationship of the parties to this proceeding. See Frye v. Texas Brine Corporation, 425 So.2d 310, 312 (La. App. 3d Cir.1982). In accord, Jarvis v. J.I. Case Co., 551 So.2d 61, 64 (La.App. 1st Cir. 1989), writs denied, 556 So.2d 56, 62 and 63 (La.1990); Oller v. Sharp Elec., Inc., 451 So.2d 1235, 1237 (La.App. 4th Cir.), writ denied, 457 So.2d 1194 (La.1984); appeal *89 after remand, 514 So.2d 176 (La.1987); writ denied, 519 So.2d 117 (La.1988).
Accordingly, I respectfully dissent.
NOTES
[1] Whoever that party may be, it and not plaintiff must ultimately bear the losses attributable to the defect. King v. Louviere, 543 So.2d 1327, 1328-29 (La.1989); Ross v. La Coste De Monterville, 502 So.2d 1026, 1032 (La.1987); Kent v. Gulf States Utilities Co., 418 So.2d 493, 497, n. 5 (La.1982). This is because the defective condition was not obvious to the victim. Cf., Desormeaux v. Audubon Ins. Co., 611 So.2d 818, 820-21 (La.App. 3d Cir.1992), writ not considered, 613 So.2d 966 (La.1993), writ denied, 613 So.2d 1002 (La.1993).
[2] Indeed, depending on facts that can only be determined by the factfinder, the employer may well be answerable in tort here for the defective board even if, say, the individuals handling the board were not employed by the landowner, but the defective board, to be used only for the landowner's one job, was owned by them. King, supra (secretary driving defective car did not have garde; owner did).