**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-31195.

Margie A. PICKETT;  Terry A. Pound;  Angenette Mullet;  Michael Brent Pickett, Plaintiffs-Appellants,

v.

RTS HELICOPTER, et al., Defendants,

PETROLEUM HELICOPTERS, INC., Intervenor-Defendant-Appellant,

v.

RTS HELICOPTER LEASING CORPORATION;  RTS Capital Services Incorporated, Defendant Third Party Plaintiffs-Appellees Appellants,

Pacific Scientific Company, Defendant Third Party Defendant-Appellee.

Nov. 26, 1997.

Appeal from the United States District Court for the Western District of Louisiana.

Before WISDOM, JOLLY and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal arises from a products liability action concerning a helicopter seat belt.  It involves interpretations of both the Louisiana Products Liability Act ("LPLA"), La.Rev.Stat.Ann. § 9:2800.51 et seq. (West 1991), and Louisiana Civil Code Article 2317, La.Civ.Code Ann. art. 2317 (West 1979).  Margie A. Pickett, Terry A. Pound, Angenette Mullet, and Michael Brent Pickett, widow and children of the helicopter pilot killed by the failure of the seat belt (the "Picketts"), and Petroleum Helicopters, Inc., his

1

employer ("PHI"), assert that Pacific Scientific Company, the manufacturer of the seat belt ("PSC"), is liable under the LPLA for making an unreasonably dangerous product. They argue that the seat belt was defective because it could be taken apart and reassembled in a way that made it likely to fail in a crash, and that there was no adequate warning of this characteristic. The Picketts further assert that RTS Helicopter Leasing Corporation, the owner of the helicopter, and RTS Capital Services, Inc., its parent company (collectively, "RTS"), are strictly liable under Article 2317 as the owners of an unreasonably dangerous thing. The district court granted both PSC's and RTS's motions for summary judgment. We affirm.

I

Drawing all reasonable inferences in the Picketts' favor,[1] the facts are the following. On November 19, 1990, a helicopter owned by RTS and leased to PHI crashed shortly after takeoff in Cameron, Louisiana. The pilot, Joseph Pickett, was fatally injured when his seat belt failed to restrain him and he was flung into the rotor. Had it operated correctly, the seat belt might well have saved his life, as the accident was not necessarily fatal.

The crash itself was caused by a PHI mechanic who removed the wrong control tube from the helicopter during routine maintenance, resulting in its total loss of cyclic control immediately after

---

[1]In examining the facts on summary judgment review, we draw "all inferences most favorable to the party opposing the motion." *Exxon Corp. v. Baton Rouge Oil and Chemical Workers Union,* 77 F.3d 850, 853 (5th Cir.1996).

take-off.  During the resulting crash, the seat belt failed because one of its components, the "take-up bar," had been at some point removed and reinserted upside down.  On this particular belt, the take-up bar is the part of the cinching mechanism that keeps the belt tight after adjustment.  Because the take-up bar was upside down at the time of the crash, the load placed on the seat belt was born by the thin, flat part of the bar, instead of the thick, round portion.  The bar slipped, allowing the seat belt to come undone, just when it was most needed.  This incorrect configuration of the take-up bar was possible because the bar was asymmetric (i.e., it had a thin, flat half and a thick, round half) and the seat belt was capable of disassembly.  At the time of manufacture of the seat belt, there existed both symmetric designs that could not be incorrectly reassembled in this way, and other designs that could not be disassembled at all.

The seat belt in question had been originally manufactured in 1971 by PSC.  It was not a part of the helicopter's original equipment, but had been installed as a replacement sometime prior to 1983.  There is no evidence that the take-up bar was upside down at any time prior to 1983.  In May of 1983, the seat belt was refurbished by Aircraft Belts, Inc.  They rewebbed the belt straps, disassembled and cleaned the metal parts, including the take-up bar, and then reassembled and relaced the belt.  Obviously, the most likely explanation for the take-up bar's being upside down at the time of the crash is that the seat belt was reassembled

3

incorrectly by Aircraft Belts.[2]  There is not, however, any direct evidence of this.  Whether a jury could reasonably infer that this is what happened is a close question that we need not reach.  For purposes of argument, we will assume that this was the cause of the take-up bar's incorrect configuration.

PSC was aware that the take-up bar could be positioned upside down.  It issued two written warnings ("Safety Bulletins"), one dated January 11, 1972, and one dated May 30, 1983, that clearly described the problem, the potential danger, and the solution with easy to understand diagrams.  There is no dispute that the warnings would have been effective to avoid the incorrect configuration of the take-up bar in the hands of someone performing a reassembly of the seat belt.  There is also no dispute that the warnings were in the possession of Tennessee Gas Pipeline Company ("Tenneco"), the owner of the helicopter from 1976 to November of 1989, as well as PHI, the lessee after November of 1989, at all relevant times.

After the accident, the Picketts brought suit against a wide variety of parties in Louisiana state court, including the manufacturer of the helicopter, PSC, Aircraft Belts, RTS, and PHI. The case was removed to federal district court on diversity grounds pursuant to 28 U.S.C. § 1441.  After being dismissed as a defendant, PHI intervened as a plaintiff to recover what it had already paid to the Picketts in compensation, should the Picketts' claims succeed.  RTS crossclaimed against PSC.  Prior to the instant motions for summary judgment, all original defendants other

---

[2]Aircraft Belts is no longer a party to this action.

than PSC and RTS had been dismissed for one reason or another. The Picketts and PHI now appeal the summary judgments entered in favor of PSC and RTS. RTS makes a protective appeal of its crossclaim against PSC.

## II

We review a grant of summary judgment *de novo.* Once a properly supported motion for summary judgment has been presented, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. In examining the facts, we draw "all inferences most favorable to the party opposing the motion." *Exxon Corp. v. Baton Rouge Oil and Chemical Workers Union,* 77 F.3d 850, 853 (5th Cir.1996). We are also mindful, however, of the underlying standards and burdens of proof. *Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The pivotal question will always be whether the non-moving party has produced sufficient evidence that a reasonable jury could find for him at a trial on the merits.

## III

### A

With regard to the Picketts' LPLA claims against PSC, the sole question before us is whether the seat belt's capability of disassembly and incorrect reassembly was a proximate cause of Mr. Pickett's death. Based on our precedent of *Graham v. Amoco Oil Co.,* 21 F.3d 643 (5th Cir.1994), we conclude that it was not.

In order to establish manufacturer's liability under the

5

LPLA, a claimant must show (1) damage, that (2) was proximately caused by (3) a characteristic of an unreasonably dangerous product during (4) a reasonably anticipated use of that product. La.Rev.Stat.Ann. § 9:2800.54 (West 1991). In order for a product to be unreasonably dangerous, it must either: (a) be defective in construction, (b) be defective in design, (c) have an inadequate warning, or (d) fail to conform to an express warranty. *Id.*

The Picketts assert claims under both the defective design and inadequate warning prongs of the LPLA. First, the Picketts argue that the seat belt was defective in design because it could be disassembled and incorrectly reassembled in a way that made it likely to fail in a crash. Under their reasoning, this capability of misassembly was the characteristic of the seat belt that caused the death of their husband and father. Because there existed alternate designs at the time of manufacture that did not have this characteristic, they conclude that the design in question was defective. Alternately, the Picketts argue that the seat belt was unreasonably dangerous because there was no adequate warning of the capability of misassembly.

Regardless of which theory of liability we consider, under the LPLA the Picketts must also establish that the actual failure of the seat belt (and thus Mr. Pickett's death) was proximately caused by the capability of misassembly. Although not in the LPLA context, we had occasion to consider the definition of proximate cause under Louisiana law in our decision of *Graham v. Amoco Oil Co.,* 21 F.3d 643 (5th Cir.1994). There, we held that proximate

6

cause is " "any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred.' " *Id.* at 648-49 (quoting *Sutton v. Duplessis,* 584 So.2d 362, 365 (La.Ct.App.1991)). More specifically, where "an accident results from two negligent acts, "one more remote and one an intervening cause, the presence of the intervening cause prevents a finding of liability on the one responsible for the more remote cause.' " *Id.*

Applying *Graham,* it is clear that the failure of the seat belt in this case was not proximately caused by the mere capability of misassembly inherent in its design. Actual failure simply could not have occurred without actual negligent misassembly, here, presumably by Aircraft Belts, and this actual misassembly is an intervening cause that breaks the "natural and continuous sequence" of events flowing from the design.[3] In the *Sutton* case relied on in *Graham,* the court reversed a finding of partial negligence on the part of a mother whose child was injured after she failed to pick him up from school as she usually did. Applying the definition stated above, the *Sutton* Court found that the child's

[3]Although there is no evidence of exactly when, how, or by whom this misassembly occurred, it is clear that it must have happened sometime after the design of the seat belt but before the accident. Greater precision is not required to resolve this case. Furthermore, given the Safety Bulletins provided by PSC, it is also clear that the misassembly occurred in direct contravention of PSC's instructions, and was at best negligent. We note, however, that under *Graham* and *Sutton* the intervening act need not rise to the level of negligence, so long as it breaks the "natural and continuous sequence." This is the focus of our inquiry.

eventual injury was proximately caused not by the mother's failure to pick him up, but by the intervening negligence of the school in failing to supervise him. The instant case involves a strikingly similar situation. Although PSC may have established a prerequisite to the eventual injury by designing a seat belt that *could* be misassembled, PSC did not proximately cause that injury because, as a matter of law, the *actual* misassembly sufficiently intervened to break the causal chain. For this reason, the Picketts' LPLA claims cannot succeed.

B

With regard to the Picketts' strict liability claim against RTS, the sole question before us is whether there is a material question of fact as to RTS's custody of the helicopter on the date of the accident. Based on our precedent of *Ellison v. Conoco, Inc.,* 950 F.2d 1196 (5th Cir.1992) (Garwood, J.), we conclude that RTS did not have custody as a matter of law.

(1)

Because this claim turns on a precise understanding of RTS's relationship to the helicopter, a few additional facts are relevant. On November 7, 1989, RTS purchased the helicopter from Tenneco with the intention of leasing it immediately to PHI. Although the record is not entirely clear about the events surrounding the transfer of the helicopter, viewed in the light most favorable to the Picketts they are as follows. On November 15, at PHI's direction, Tenneco delivered the helicopter directly from its facility in Houston, Texas, to PHI's facility in

8

Lafayette, Louisiana. On hand for the delivery was one Terry Doehling, an independent contractor working for RTS. Doehling signed a delivery receipt for Tenneco which provided that RTS had "caused [the helicopter] to be inspected and reinspected," that RTS "accept[ed] [the helicopter] as suitable for purchase," and that it was "delivered to the undersigned on behalf of RTS." Doehling signed this receipt as RTS's "regional manager." There is no evidence, however, that Doehling ever himself inspected or even laid a hand on the helicopter. It is undisputed that he signed the receipt after simply visually verifying that the helicopter had arrived.

The lease between RTS and PHI was not signed and did not take effect until November 27. Under the terms of the lease, PHI had the sole right and responsibility to determine how the helicopter was to be used, where it was to be flown, and what maintenance, inspections, and repairs were to be performed on it. There is no evidence that this was not, in fact, the arrangement between RTS and PHI, and no evidence that it was not actually in place as of November 15, as RTS asserts. In particular, there is no evidence that RTS had any power to affect any aspect of the helicopter's usage, direction, or control, including matters of maintenance and inspection, at any time.

(2)

The Picketts' strict liability claim against RTS is based on Louisiana Civil Code Article 2317. It provides, in relevant part: "We are responsible, not only for the damage occasioned by our own

9

act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."[4] In a normal case of statutory construction, where the meaning of a code provision was plain, our statement of the law might well end at this point, and we could proceed to an application of the clear language to the facts at hand. *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 566, 114 S.Ct. 1757, 1775-76, 128 L.Ed.2d 556 (1994) (Scalia, J.). Unfortunately, we cannot apply so simple an analysis to this case. As a matter of Louisiana law, the construction of Article 2317 has been placed in a peculiar context that has little to do with a common sense interpretation of the words quoted above. In *Ross v. La Coste de Monterville,* 502 So.2d 1026 (La.1987) (Dennis, J.), the Louisiana Supreme Court held that an owner who transfers possession, but not ownership, of a thing to another party nonetheless retains custody of the thing for purposes of Article 2317. In *Ellison v. Conoco, Inc.,* 950 F.2d 1196 (5th Cir.1992), however, we held that the *Ross* rule did not apply to a finance entity owner that never had actual possession of the thing.

The Picketts argue that as an owner who transferred possession, but not ownership, to PHI, RTS continued to have custody of the helicopter under *Ross.* RTS counters that, under *Ellison,* it never had custody of the helicopter, since it never had the helicopter in its physical possession. Thus, unlike the defendant in *Ross,* it could not have "continu[ed] to have" custody.

---

[4]There is one additional sentence in Article 2317: "This, however, is to be understood with the following modifications."

The Picketts reply in the alternative that there is a dispute in the record as to whether RTS physically possessed the helicopter for some brief period of time on November 15, 1989. They contend that, if the jury found that there was both ownership and possession on this date, RTS would, as a matter of law, have acquired custody under *Ellison.* The district court agreed with RTS that *Ellison* controlled and that there was no genuine issue as to possession. Although we agree with the district court and RTS that *Ellison* controls this case, we find the term "possession" singularly uninformative in the case of corporate entities like RTS. To clarify what constitutes "possession" for purposes of *Ellison,* we must briefly review the tangled history of Article 2317.

(3)

The current Article 2317 is an exact copy of the English text of Article 2296 of the Code of 1825, which was published in both a French and an English version. The French text of Article 2296, in turn, was an almost exact copy of the French text of the first paragraph of Article 20 of the Code of 1808.[5] Like much of the Code of 1808, the first paragraph of Article 20 was drawn directly from the Code Napoleon, where its almost identical counterpart was and is Article 1384(1).[6] Under Louisiana law, it is well established that the French version of the Code of 1825 is

---

[5]The sole difference being the addition of the French counterpart to the sentence in note 4.

[6]Article 1384(1) of the Code Napoleon differs from the first paragraph of Article 20 of the Code of 1808 only in punctuation.

11

controlling as to articles with a civilian heritage that have not been changed since that time.[7]  *Ross,* 502 So.2d at 1030 (citing *Sample v. Whitaker,* 172 La. 722, 135 So. 38 (1931), and other cases);  *Shelp v. National Sur. Corp.,* 333 F.2d 431, 439 (5th Cir.1964) (Wisdom, J.).

This rule applies here in the application of Article 2317. Furthermore, in this case the French version of Article 2296 of the Code of 1825 differs in one important respect from the English. Where the English text has "in our custody," the French text uses the words "*sous sa garde.*"[8]  As both this court and the Louisiana Supreme Court have held in the past, the French word *garde* as used in Article 2296 is a civilian term of art that incorporates shades of meaning beyond the literal English translation of "custody." *Ross,* 502 So.2d at 1030;  *Ellison,* 950 F.2d at 1208.  Just what it does mean is a matter of some complexity, however.  In particular, the interrelation between ownership and possession for purposes of allocating *garde* is less than clear.

The development of the theory of *garde* in Louisiana law has remained closely tied to its civilian heritage.[9]  In *Loescher v.*

---

[7]Although Article 2317 had not been changed as of the events in this case, it now has been.

[8]The complete French text of Article 2296 of the Code of 1825 reads:  "*On est responsable, non seulement du dommage que l'on cause par son propre fait, mais encore de celui qui est causé par le fait des personnes dont on doit répondre, ou des choses que l'on a sous sa garde;  ce qui doit s'entendre avec les modifications suivantes.*"  Apart from the *garde* issue, this text accords closely with the English translation quoted above.

[9]That Louisiana law has not strayed far from French law in this respect is due, for the most part, to the relatively recent

12

*Parr,* 324 So.2d 441 (La.1975), the Louisiana Supreme Court held that the owner and possessor of a lot had *garde* of a tree on the lot, and was strictly liable for the damage caused when the otherwise healthy looking tree fell on his neighbor's Cadillac. Citing a secondhand translation of a French legal dictionary, the court defined *garde* as the "[o]bligation imposed by the law on the proprietor of a thing or of an animal or on the one who avails

"discovery" of Article 2317. *See generally* Joseph S. Piacun, Comment, *The Abolition of Strict Liability in Louisiana: A Return to a Fairer Standard or an Impossible Burden for Plaintiffs?,* 43 Loyola L.Rev. 215 (1997). For the entirety of Article 2296's existence, and the majority of Article 2317's, their text was not attributed any substantive meaning at all. Rather, it was thought to be an introduction to the articles directly following, which created substantive rules of vicarious liability for damage caused by minors (Article 2297), incompetents (Article 2298), servants and apprentices (Article 2299), slaves (Article 2300), animals (Article 2301), and ruinous buildings (Article 2302). The same was largely true in France with respect to the Code civil's counterpart Article 1384(1), until 1896. In that year, the Cour de cassation, under pressure to create a rule of strict liability for industrial accidents, "discovered" just such a general rule in Article 1384(1). *See Guissez, Cousin et Oriolle v. Teffaine,* Cass. civ., June 16, 1896, D.P. 1897.I.433, Saleilles, S.Jur. 1897.I.17, Esmein, *reprinted in English translation with commentary in* Arthur Taylor von Mehren and James Russel Gordley, *The Civil Law System* 608-11 (2d ed.1977). As this reading became infectious throughout the Civilian world, the treatment of Article 2317 in the Louisiana case law became increasingly muddled. *See generally* Gary E. Theall, Note, *Things in One's Custody—Louisiana Civil Code Article 2317,* 43 Tulane L.Rev. 907 (1969). Some courts retained the belief that it was introductory, *see, e.g., Adams v. Golson,* 187 La. 363, 174 So. 876 (1937); *Arrington v. Hearin Tank Lines,* 80 So.2d 167 (La.App. 2d Cir.1955), while others treated it as creating a substantive presumption of liability for damage caused by some things, *see, e.g., Vidrine v. Evangeline Gravel Co.,* 6 La.App. 468 (1st Cir.1927). It was not until 1975 that the Louisiana Supreme Court made a definitive ruling (over vigorous dissent) that Article 2317 established a general rule of strict liability for things in one's *garde* with unreasonably dangerous defects. *Loescher v. Parr,* 324 So.2d 441 (La.1975) (Tate, J., with Marcus, J., dissenting).

himself of it to prevent this thing or this animal from causing damage to others."  324 So.2d at 447 n. 6.  Although the question in *Loescher* allowed the court to skirt the possession-versus-ownership issue, they noted in dictum that, based on French legal theory, one could "lose the custody of a thing without losing its "garde.' "  324 So.2d at 447 n. 6 (citing Henri, Leon & Jean Mazeaud, 2 *Traité Théoretique et Pratique de la Responsabilité Civile Délictuelle et Contractuelle* No. 1160 at 218-24 (André Tunc ed., 6th ed.1970)).  In *Ross,* the court picked up this thread and held that the owner of a step ladder continued to have *garde* of the ladder after he had gratuitously lent it to his tenant.  502 So.2d at 1032.  *Ross* speaks only of an owner "continu[ing] to have" *garde,* however, and does not address the prerequisites for an owner to acquire *garde* in the first instance. This gap did not go unnoticed, and we held in *Ellison* that where an owner never had possession of a thing, he did not acquire *garde* in the first place.  In *Ellison,* Judge Garwood reasoned that "[b]ecause [the owner] never possessed, controlled, or operated [the thing] ..., it follows that [he] was never in a position to correct defects that might have arisen."  950 F.2d at 1209.

The requirement of past possession announced in *Ellison* can be traced to the French sources underlying *Ross.  Ross* relies heavily on French legal theory, including the Mazeaud treatise cited in *Loescher,* and a case from the Cour de cassation, France's highest appellate tribunal.  In *Société Commerciale Européenne des Brasseries "Brasseries de la Meuse" v. Etablissements Boussois-*

14

*Souchon-Neuvesel et al.,* Cass. 2e civ., June 5, 1971, 1971 Bull.Civ. II, No. 204, *reprinted in English translation with commentary in* Arthur Taylor von Mehren and James Russel Gordley, *The Civil Law System* 676-78 (2d ed.1977), the plaintiff was injured by a defect in a bottle of carbonated lemonade that caused it to explode. Affirming the trial court, the Cour de cassation held the bottler liable under Article 1384(1) because it retained the *garde* of the bottle after transfer to the plaintiff. Ignoring both ownership and physical possession, which apparently resided in the plaintiff at the time of the accident, the court looked instead to the fact that the bottler retained *control* over the bottle, which periodically came back to the bottler for washing, testing, and refilling (presumably after being turned in for a deposit). Since the plaintiff had no such control over the bottle, and no practical opportunity to test the bottle for defects, the court concluded that the bottler retained the *garde.*

The result in the *Brasseries de la Meuse* case is no outlier, inasmuch as the power of "usage, direction, and control," not physical possession or bare ownership,[10] has always been the touchstone of *garde* in French law. 2 Mazeaud No. 1160 at 218-24. In a closely related situation, the law is clear that if the bare owner does not have the substantial power of "usage, direction, and control," he cannot have *garde,* and it falls on the party that does have this power: "If the attributes of ownership are divided due

_____

[10]"*Détention au sens intellectuel* " versus "*détention << lato sensu >>.*"  2 Mazeaud No. 1160 at 220.

15

to the existence of a property right in a thing other than ownership, for example a usufruct, the "*garde* ' attaches in principle to the one whose right gives him the power of command with regard to the thing, "the usage, direction and control' of the thing.  Thus, the usufructuary would have the *garde,* not the bare owner."[11]

Based on the *Brasseries de la Meuse* case and the French commentators relied on in *Ross,* it is clear that *garde* attaches to the owner of a thing when he acquires the substantial power of usage, direction, and control of the thing, including the practical ability to discover defects, and remains with him so long as he has that power, regardless of who has the physical possession at any given time.[12]  In *Ross* itself, the owner of the step ladder had lent it out for only a short period of time, and expected it to return

---

[11]Or, in the original:  "*Si les attributs du droit de propriété sont divisés, par suite de l'existence sur la chose d'un droit réel autre que le droit de propriété, usufruit par exemple, la << garde >> appartient en principe à celui auquel son droit permet d'avoir le pouvoir de commandement relativement à la chose, << l'usage, la direction et le contrôle >> de cette chose. L'usufruitier sera donc gardien, non le nu-propriétaire.*"  2 Mazeaud No. 1162 at 233.

[12]We note in passing that this reading of the theory accords with much of the post-*Ross* jurisprudence in Louisiana's lower courts.  *See, e.g., Gullatt v. Newell Industries,* 29,322 (La.App. 2 Cir. 12/11/96), 688 So.2d 1191 (owner of title to land that arguably included a shredder made a fixture thereto did not have *garde* of the shredder in part because he had no "access or maintenance rights to [it]");  *Mix v. Krewe of Petronius,* 95-1793 (La.App. 4 Cir. 5/22/96), 675 So.2d 792 (lessee of auditorium did not have *garde* of it because "the lease term was for a matter of hours, not years, lessee had no opportunity to inspect, repaint or reconfigure the lighting system ... and ... no right of direction and control.");  *Thumfart v. Lombard,* 613 So.2d 286 (La.App. 4 Cir.1993) ("[c]ustody, distinct from ownership, refers to a person's supervision and control (garde) over a thing").

16

to his possession shortly. On an ongoing basis, he had the substantial power of "usage, direction, and control" of the ladder, and ample opportunity to examine it for defects, even though he did not have it in his physical possession at the time of the accident. The situation was almost identical to that in the *Brasseries de la Meuse* case, and the *Ross* Court was quite correct to conclude that the owner retained the *garde.* In *Ellison,* on the other hand, the owner was a finance entity that purchased the title to certain oil drilling equipment and immediately leased it back to the former owner without disturbing possession. Applying the same theory of *garde,* the *Ellison* Court was also quite correct to conclude that the finance entity never acquired *garde* in the first place. "Because [the finance entity] never possessed, controlled, or operated [the equipment] ..., it follows that [it] was never in a position to correct defects that might have arisen." *Ellison,* 950 F.2d at 1209.

Based on this reading of *Ross* and *Ellison,* we hold that, for purposes of applying Article 2317, *Ellison* 's "possession" means, at a minimum, the substantial power of usage, direction, and control, including the practical ability to discover defects, or what the French would call "*détention au sens intellectuel.*"[13] Physical possession, while relevant, is not a touchstone, and neither *Ellison* nor *Ross* is to the contrary.

(4)

Turning, at long last, to the facts of the instant case, we

_____

[13]See note 10.

17

find that there is no material issue of fact as to whether RTS had *garde* of the helicopter at any relevant time. The Picketts do not even allege that RTS ever had any kind of substantial power of usage, direction, or control of the helicopter, or that RTS was ever in a position to discover defects through maintenance, and the evidence is undisputed that this was not the case. Rather, the evidence is clear that from the moment that Tenneco delivered the helicopter to PHI's facility in Lafayette (at PHI's direction), the helicopter was subject to the exclusive power of PHI under the terms of a long-term lease. Although the presence of Mr. Doehling at PHI's facility might be read to constitute a brief moment of physical possession by RTS in some sense, we do not find this probative of the real question posed by *Ellison,* namely: Did RTS ever have the substantial power of usage, direction, and control? In the end, this case is very similar to *Ellison,* as RTS was essentially the same kind of finance entity owner, albeit a slightly less trusting one in that it sent a representative to ensure that the financed asset was actually delivered. For these reasons, we agree with the district court that, as a matter of law, RTS did not have custody of the helicopter at the time of the crash, and the Picketts' claim under Article 2317 cannot succeed.

IV

In conclusion, we hold that PSC cannot be held liable under the LPLA for the failure of its seat belt because this failure was not proximately caused by any characteristic of the seat belt itself. We also hold that RTS cannot be held strictly liable under

18

Article 2317 because it never had the substantial power of usage, direction, and control of the helicopter, and thus did not acquire *garde* of the helicopter under Louisiana law.  The judgment of the district court is AFFIRMED.  Because we affirm the district court, RTS's protective appeal is DISMISSED AS MOOT.

AFFIRMED.