IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-31294
Summary Calendar
_____

WILLIE O. DIXON, JR.,

     Plaintiff-Appellant,

  v.

SUTCLIFFE INC; ET AL,

     Defendants,

LSB HOLDING INC; LSB INDUSTRIES INC; JOE REDMON; SUMMIT MACHINE
TOOLS INC,

     Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Louisiana
(97-CV-105)
_____

Aguust 31, 1999

Before KING, Chief Judge, and JOLLY and DUHE, Circuit Judges.

PER CURIAM:[*]

    Plaintiff-appellant Willie O. Dixon, Jr. appeals from an
adverse judgment whereby the district court granted summary
judgment to defendants-appellees LSB Holding Inc., LSB Industries
Inc., and Summit Machine Tools Inc. in this personal injury
diversity action.  We reverse and remand to the district court

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

for further proceedings.

## I. FACTUAL AND PROCEDURAL HISTORY

This lawsuit stems from an injury suffered by plaintiff-appellant Willie O. Dixon, Jr. while working on a drilling rig in Fort Polk, Louisiana. Co-Energy Group, an entity under contract with the federal government to drill water wells at Fort Polk, hired Dixon on October 2, 1995 to assist with its drilling operations.[1] Dixon's injury occurred on October 12, 1995 on a drilling rig that Co-Energy was leasing from defendant-appellee Summit Machine Tools Inc. (Summit). Summit is a wholly-owned subsidiary of defendant-appellee LSB Holding Inc. (Holding), which in turn is a wholly-owned subsidiary of defendant-appellee LSB Industries Inc. (Industries).[2]

After falling behind schedule on its federal contract, Co-Energy contacted the LSB entities about obtaining additional drilling rigs. In August 1995, the rig at issue in this lawsuit was purchased from Sutcliffe, Inc. (Sutcliffe), a Kansas corporation. Concurrent with the purchase, Sutcliffe was asked to make certain repairs to the rig. Sutcliffe thereafter performed the requested repairs and Holding paid Sutcliffe for the purchase and repairs. Sutcliffe issued title to the rig in Summit's name.

Summit and Co-Energy entered into an agreement for the lease

---

[1] Co-Energy and its subsidiary, Cepolk Ltd., will be referred to collectively as "Co-Energy."

[2] Defendants-appellees Industries, Holding, and Summit will be referred to collectively as "the LSB entities."

of the rig on August 29, 1995.  Summit transferred physical possession of the rig from Sutcliffe to Co-Energy in mid-September 1995.  The rig went into operation in early October 1995, and the accident occurred on October 12, 1995.

On October 4, 1996, Dixon filed suit in Louisiana district court, naming as defendants Industries, Holding, Summit, Sutcliffe, and Joe Redman, a former Co-Energy employee.  The LSB entities removed the matter to the District Court for the Western District of Louisiana.  On September 3, 1998, the LSB entities moved for summary judgment.  The district court granted the summary judgment motion on October 21, 1998, and, on November 13, 1998, certified the judgment as final pursuant to Federal Rule of Civil Procedure 54(b).  Dixon filed his timely notice of appeal on November 13, 1998.

## II.  STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, applying the same standards as the district court.  See Ellison v. Connor, 153 F.3d 247, 251 (5th Cir. 1998); Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  We must view the inferences to be drawn from the facts contained in the record in the light most favorable to Dixon, the party opposing the motion.

3

See <u>Connor</u>, 153 F.3d at 247; <u>Norman</u>, 19 F.3d at 1021.

## III. DISCUSSION

Dixon argues that the LSB entities, as owners of the rig, are liable for the harm to him caused by the rig's defective condition. The LSB entities contend that they never had sufficient control of the rig to render them strictly liable under Louisiana law. The district court agreed, holding that the LSB entities could not be strictly liable under Article 2317 of the Louisiana Civil Code because they never had "custody" of the rig, as that term is used in Louisiana law.

Article 2317 states in relevant part: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." LA. CIV. CODE ANN. art. 2317 (West 1997). The term "custody" derives its meaning from the French concept of garde. See <u>Ross v. La Coste de Monterville</u>, 502 So. 2d 1026, 1029 (La. 1987). The Louisiana Supreme Court has explained that the owner of an object containing structural defects continues to have garde of its structure, and thus may be liable for resulting injuries, even though the owner does not have physical possession of the object at the time that the object causes injury. See <u>id.</u> at 1032 ("[W]e conclude that an owner of a thing who transfers its possession, but not its ownership to another, continues to have the <u>garde</u> of its structure and is obliged to protect others from damage caused by structural defects arising before the

4

transfer."). In Ross, the owner of a ladder who had lent it to a tenant was held liable for the injuries caused by a structural defect in the ladder, even though the owner did not have possession of the ladder at the time of the accident. See id. at 1027-28. On this basis, Dixon argues that the LSB entities cannot escape liability merely because they did not have possession of the rig at the time Dixon was injured.

Later cases have clarified the concept of garde. In Ellison v. Conoco, Inc., 950 F.2d 1196 (5th Cir. 1992), this court affirmed the grant of summary judgment to a defendant who owned defective equipment on the ground that the defendant never acquired garde of the equipment. See id. at 1209. In Ellison, the injured plaintiff's employer had designed and manufactured the equipment that caused the plaintiff's injury. See id. at 1208. However, due to capitalization problems, the employer had sold the equipment to the defendant, who immediately leased it back to the employer. See id. At no time did the equipment physically change hands. See id. Under these circumstances, we concluded that "[b]ecause [the defendant] never possessed, controlled, or operated [the equipment] (and had no part in its design or manufacture), it follows that [the defendant] was therefore never in a position to correct defects that might have arisen," and thus had not acquired garde. Id. at 1209.

Similarly, in Pickett v. RTS Helicopter, 128 F.3d 925 (5th Cir. 1997), we affirmed the grant of summary judgment to the owner of a helicopter on the ground that the owner had never

5

acquired garde of the helicopter. See id. at 933. The relatives

of a pilot killed in a crash argued that the owner of the

helicopter was strictly liable under Article 2317 for a defect in

the helicopter. See id. at 927. However, the owner did not have

possession at the time of the crash, and had purchased the

helicopter with the intention of immediately leasing it to the

pilot's employer. See id. at 929-30. The owner's only contact

with the helicopter had been when its agent accepted delivery of

the helicopter at the employer's place of business and signed a

delivery receipt to that effect. See id. There was no evidence

that the agent had ever inspected the helicopter, and the

employer had exclusive control of the helicopter thereafter. See

id. After examining the relevant case law, we described the

concept of garde as follows:

> [I]t is clear that garde attaches to the owner of a thing
> when he acquires the substantial power of usage, direction,
> and control of the thing, including the practical ability to
> discover defects, and remains with him so long as he has
> that power, regardless of who has the physical possession at
> any given time.

Id. at 932. Because the helicopter's owner was never in a

position to use, direct, or control the helicopter, and because

the limited contact the owner had with the helicopter did not put

the owner in a position to discover defects, we affirmed the

district court's grant of summary judgment to the owner. See id.

at 933.

In Alford v. Home Insurance Co., 701 So. 2d 1375 (La. Ct.

App. 1997), writ denied, 709 So. 2d 749 (La. 1998), the defendant

was the owner of equipment that had caused injury to the

6

plaintiff while under lease to a third-party lessee and while in possession of the lessee. See id. at 1376. The trial court held that the defendant did not have garde of the equipment and granted summary judgment. See id. The court of appeals reversed. See id. at 1378. Although the lease placed the responsibility for repair and maintenance, as well as the entire risk of using and operating the equipment, on the lessee, the court of appeals found that there were material issues of fact preventing summary judgment, including whether the alleged defect arose prior to the lease of the equipment and whether it was intended that the defendant would reacquire possession of the equipment at the end of the lease. See id. at 1377-78. This situation differs slightly from our own because there is no indication from the court's discussion in Alford that the defendant did not have possession of the equipment prior to leasing it to the lessee. Thus, the relevant issue in Alford was whether, with the transfer of the equipment, garde had been transferred from the defendant to the lessee, not whether the defendant ever had garde to begin with.

The question for our decision is whether the LSB entities ever acquired garde in the first instance. This turns on whether the LSB entities ever acquired "the substantial power of usage, direction, and control, including the practical ability to discover defects." Pickett, 128 F.3d at 933; see Ellison, 950 F.2d at 1209.

The district court found that the LSB entities did not have

garde of the rig because Dale Redman, the person who located the rig for purchase by the LSB entities and lease to Co-Energy, was actually working for Co-Energy at the time of the purchase. According to the district court, Dale Redman and his brother, Joe Redman, acting as Co-Energy employees, located the rig and supervised the repairs made to it prior to its transfer to Co-Energy. The court relied on testimony that, although Dale is a vice-president of Industries, he took a leave of absence from Industries to serve as a consultant to Co-Energy on the Fort Polk project, and on testimony that Co-Energy hired Joe, on Dale's recommendation, to serve as drill superintendent on the project before Joe participated in finding and repairing the rig. These facts indicated to the district court that it was Co-Energy, not the LSB entities, that supervised the purchase of the rig and the repairs made to it prior to its transfer to Co-Energy. According to the court, the LSB entities never had the power of usage, direction and control, or the practical ability to discover defects, and thus never acquired garde of the rig.

After a careful review of the record, we disagree. Drawing all inferences in favor of Dixon, as we must, we conclude that there is a genuine issue of material fact as to what entity Dale Redman was working for at the time that he negotiated the purchase of the rig, inspected the rig, and directed that repairs be performed to the rig. Although Dale testified at his deposition that he was working for Co-Energy at the time he located the rig, in his affidavit dated a year earlier, he stated

8

"[t]hat at the time Sutcliffe sold the Mayhew 1000 drilling rig to Summit . . . in 1995, he was a corporate officer of LSB Industries, Inc."

Dale's deposition testimony conflicts with this statement, but is not entirely to the contrary, and can be interpreted as consistent with the proposition that Dale served as an agent for the LSB entities during the purchase and repair of the rig. During his deposition, he could not remember exactly when he began working for Co-Energy and testified that it was "[s]omewhere around August 1995." Before that time, there is no dispute that he was a vice-president at Industries. As to the circumstances surrounding his relationship with Co-Energy, Dale testified that he was called into a meeting at Industries with his boss and with representatives of Co-Energy and was asked to become a consultant for Co-Energy on the Fort Polk project. He then took a leave of absence from Industries to work for Co-Energy, which lasted until December 1995. On Dale's recommendation, Co-Energy hired his brother, Joe, to serve as drill superintendent.[3]

Dale and Joe then went about locating a rig for the LSB entities to purchase for lease to Co-Energy. Dale looked through newspapers to locate people selling drilling rigs and found

---

[3] Joe Redman began working for Co-Energy in August 1995. Before that time he had been self-employed and has never been an employee of the LSB entities. After his employment with Co-Energy ended in December 1995, Joe returned to self-employment. Thus, it is clear that during the relevant time period Joe acted strictly on behalf of Co-Energy.

Sutcliffe.  Joe went to look at Sutcliffe's rig first.  Dale thereafter drove up to Kansas to meet Joe and inspect the rig. After arriving in Kansas, Dale "looked at the rig, reviewed it and negotiated the purchase with Mr. Sutcliffe."

Before the rig was transferred to Fort Polk, Dale and Joe negotiated with Sutcliffe to perform certain repairs to the rig, including repairs to the drawworks and the rig brakes.  According to Dale, "I am personally aware that [Joe and I] negotiated repairs to be made."  Joe was present intermittently during the repair process.  Dale never personally observed the repairs being made to the rig, but saw that the repairs had been made once the rig arrived at Fort Polk.

Holding thereafter paid the purchase price of the rig and also paid for the repairs.  Dale instructed Sutcliffe to issue title to the rig in Summit's name and also instructed a common carrier to pick up the rig in Kansas and deliver it to Fort Polk.

Although the record supports the interpretation that Dale was searching for a rig that met Co-Energy's needs for the Fort Polk project and, in this sense, was acting in his capacity as consultant to the Fort Polk project, there is no evidence that Co-Energy had the authority to act on behalf of the LSB entities in negotiating for the purchase of the rig or in directing that repairs be made to the rig.  Moreover, it was the LSB entities, not Co-Energy, that paid for the rig and the repairs.  Thus, the record also supports the interpretation that Dale was acting as an agent for the LSB entities during his negotiations surrounding

the purchase and repair of the rig.  Dale himself admitted that he acted as a representative of Holding and Summit during these negotiations.  When asked whether he had ever worked for Holding or Summit he answered that he had "[t]o the extent that [he]

purchased some rigs on the instruction of Co-Energy."  Counsel then asked, "That's the only time you have ever worked for [Holding or Summit]?"  Dale answered, "That's correct."

It is clear that the actions of Dale Redman in locating the rig, inspecting it for suitability, and directing that repairs be performed to it were sufficient to confer garde of the rig.  Cf. Pickett, 128 F.3d at 930 (finding that defendant had not acquired garde where "there is no evidence . . . that [the defendant's agent] ever inspected or even laid a hand on the helicopter").  If Dale can be said to have been acting as an agent for the LSB entities at the time of the inspection, purchase, and repair of the rig, which appears possible from the record, then the LSB entities, through their agent Dale, did have "the substantial power of usage, direction, and control [of the rig], including the practical ability to discover defects."  Pickett, 128 F.3d at 933; see Ellison, 950 F.2d at 1209.  If the LSB entities did acquire garde through Dale, the transfer of the rig to Co-Energy did not divest the LSB entities of garde of the rig because there is no dispute that, at the end of the project, Co-Energy returned the leased rig to the LSB entities.  Thus, this case differs from Ellison and Pickett in which the lessor was merely a finance entity and it was intended that the equipment was always to remain with the lessee.  See Pickett, 128 F.3d at 929-30, 933; Ellison, 950 F.2d at 1208; cf. Alford, 701 So. 2d at 1378 (finding a genuine issue of material fact as to whether the lessor was to regain possession of the equipment at the end of the lease).  Because there is a genuine issue of material fact as to Dale Redman's status during the negotiations for the purchase

12

of the rig that caused Dixon's injury, summary judgment was inappropriate.[4]

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

---

[4] We express no opinion as to whether the evidence is sufficient to establish that all three LSB entities acquired garde of the rig or whether any of them might still be entitled to summary judgment. We also express no opinion as to whether there was sufficient evidence of the existence of a defect that predated the transfer of the rig from Summit to Co-Energy.